966 F.2d 539
 60 USLW 2735, 27 Collier Bankr.Cas.2d 67,
23 Bankr.Ct.Dec. 1,
Bankr. L. Rep. P 74,608
 In re Randy L. CROOK and John Wedman, Debtors.
STATE OF OKLAHOMA, EX REL. COMMISSIONERS OF THE LAND OFFICE, Appellant,
v.
Randy L. CROOK and John Wedman, Appellees,
and
United States of America, Defendant-Intervenor-Appellee.
 Nos. 91-6204, 91-6206 and 91-6207.
 United States Court of Appeals,
Tenth Circuit.
 May 12, 1992.
 
 Perry E. Kaufman, Asst. Gen. Counsel, State of Okl., Oklahoma City, Okl. (Dennis W. Arrow, Oklahoma City University School of Law, Oklahoma City, Okl., with him on the brief), for appellant.
 Bruce G. Forrest, U.S. Dept. of Justice, Washington, D.C. (Stuart M. Gerson, Asst. Atty. Gen., Washington, D.C., Timothy D. Leonard, U.S. Atty., Oklahoma City, Okl., William Kanter, U.S. Dept. of Justice, Washington, D.C., with him on the brief), for defendant-intervenor-appellee.
 John J. Jerome, Milbank, Tweed, Hadley & McCloy, Richard Lieb, Kronish, Lieb, Weiner & Hellman, New York City, filed an amicus curiae brief for the Ass'n of the Bar of the City of New York, The Committee on Bankruptcy and Corporate Reorganization.
 Before ANDERSON, ALDISERT* and BRORBY, Circuit Judges.
 ALDISERT, Senior Circuit Judge.
 
 
 1
 This appeal by the state of Oklahoma requires us to decide if the bankruptcy court's action in "writing down" a mortgage held by the state of Oklahoma violates the state's sovereign immunity under the Tenth and Eleventh Amendments. Oklahoma holds mortgages on property owned by two debtors in bankruptcy.
 
 
 2
 In reorganization proceedings, the bankruptcy code permits the court to "write down" certain debts, that is, to declare the debt to be secured up to the actual market value of the property, while any additional indebtedness becomes unsecured debt. 11 U.S.C. 506(a).[1] This provision applies against the states. 11 U.S.C. § 106(c). Through the Commissioners of the Land Office, the state appeared specially in the bankruptcy court and argued that the Tenth and Eleventh Amendments to the United States Constitution forbade the court's segregation of the mortgages into secured and unsecured claims.
 
 
 3
 The bankruptcy court and the district court rejected Oklahoma's contention and reasoned that Congress' Article I bankruptcy power is superior to the state's Tenth and Eleventh Amendment sovereignty. We also reject Oklahoma's contention, but for different reasons. We conclude that the bankruptcy court had the power to write down the mortgages not on the basis of the comparative scope of Congress' Article I power, but rather on the basis of the particular species of relief granted here. The Supreme Court has long held that declaratory or injunctive relief against the states does not touch on the states' constitutional sovereignty, even though this relief results in some incidental expenditure of state funds. The bankruptcy court's order in the present case granted relief of exactly this sort; it did not award money damages. We affirm.
 
 
 4
 The debtors here sought the protection of the bankruptcy courts under the provisions of Chapter 12, 11 U.S.C. § 1201 et seq., covering family farms. The state argues that the bankruptcy court lacked jurisdiction to dispose of the state's mortgage. The district court's review of the bankruptcy court's final order was proper under 28 U.S.C. § 158(a). A timely appeal was taken, and this court has jurisdiction under 28 U.S.C. § 158(d).
 
 I.
 
 5
 The facts in these consolidated cases are undisputed and identical in all material respects. Wedman and Crook each had mortgaged property to the Commissioners of the Land Office, an agency of the state of Oklahoma. The state foreclosed on the mortgages, and the debtors filed for bankruptcy under Chapter 12. As part of the debtors' reorganization plans, the bankruptcy court applied the provisions of 11 U.S.C. § 506(a):
 
 
 6
 An allowed claim of a creditor secured by a lien on property in which the estate has an interest ... is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property ... and is an unsecured claim to the extent that the value of such creditor's interest ... is less than the amount of such allowed claim.
 
 
 7
 Liens held by the state are also subject to this statutory mandate, by virtue of 11 U.S.C. § 106(c):
 
 
 8
 Except as provided in subsections (a) and (b) of this section and notwithstanding any assertion of sovereign immunity--
 
 
 9
 (1) a provision of this title that contains "creditor", "entity", of "governmental unit" applies to governmental units; and
 
 
 10
 (2) a determination by the court of an issue arising under such a provision binds governmental units.
 
 
 11
 "Governmental unit" is elsewhere defined to include the states and their departments, agencies and instrumentalities. Id. § 101(27). The exceptions set out in subsections (a) and (b) concern offsets and compulsory counterclaims and are not relevant here.
 
 
 12
 Applying these provisions, the bankruptcy court declared the state's notes to be secured only to the extent of the current market value of the properties; the amount of the debt exceeding the current market value was converted to unsecured debt. The state did not file proofs of claim but appeared specially to contest the bankruptcy court's constitutional authority to exercise jurisdiction over the state's mortgage interests. The court entered orders approving the debtors' reorganization plans, which included the writing down of the state's mortgage notes. These orders were made subject to the state's jurisdictional objection.
 
 
 13
 The bankruptcy court then consolidated the cases and sat en banc to hear argument on the jurisdictional issue. The state's argument proceeded as follows: under the Oklahoma Enabling Act, Pub.L. No. 59-234, 34 Stat. 267 (1906), Oklahoma received certain lands and funds to be held in trust; the Oklahoma Constitution requires that the state reimburse the trust in the event of any losses, Okla. Const. art. XI, § 2; the Commissioners of the Land Office invested trust funds in the mortgages involved here; if a portion of the debt is unrecoverable as a result of the bankruptcy court's "write down," the state will be obliged to reimburse the fund out of the state treasury; such a federal court judgment therefore results in "depletion of state coffers through the exercise of unconsented state jurisdiction," Appellant's Br. at 6, and violates the state's sovereign immunity.
 
 
 14
 The court rejected the state's contentions. First, the court followed Pennsylvania v. Union Gas, 491 U.S. 1, 109 S.Ct. 2273, 105 L.Ed.2d 1 (1989), in which the Supreme Court held that Congress' commerce power permitted it to abrogate the states' Eleventh Amendment immunity from suit. The bankruptcy court reasoned that, because Article I makes no distinctions between the commerce power and bankruptcy power, the latter also permits Congress to abrogate the states' immunity.
 
 
 15
 Next, the court noted that abrogation of the states' immunity can only occur by "unmistakably clear" statutory language. Atascadero State Hospital v. Scanlon, 473 U.S. 234, 242, 105 S.Ct. 3142, 3147, 87 L.Ed.2d 171 (1985). The court then observed that in Hoffman v. Connecticut Income Maint. Dept., 492 U.S. 96, 109 S.Ct. 2818, 106 L.Ed.2d 76 (1989), the Supreme Court split 4-4 on the question whether Section 106(c) contains such "unmistakably clear" language. The bankruptcy court stepped into the breach and stated that Section 106(c) is "unmistakably clear," and the states therefore are subject to its provisions.
 
 
 16
 Following this ruling, the orders confirming the reorganization plans became final. The state appealed, and the United States intervened pursuant to 28 U.S.C. § 2403(a) to answer the state's challenge to the constitutionality of Section 106(c). The district court affirmed, employing the same analysis used by the bankruptcy court. The district court also rejected Oklahoma's argument that the bankruptcy court has interfered with the state's sovereign functions in violation of the Tenth Amendment.
 
 
 17
 The appeal came before this court with the United States briefing and arguing the case for all appellees.
 
 II.
 
 18
 This appeal raises questions of law reviewable de novo in this court. Matter of Tri-State Equip., Inc., 792 F.2d 967, 970 (10th Cir.1986).
 
 III.
 
 19
 Three issues are presented for our consideration: Whether Section 106(c) contains "unmistakably clear" language indicating that Congress meant it to apply against the states, thus abrogating the states' Eleventh Amendment immunity; if so, we must decide whether the Article 1 bankruptcy power authorizes Congress to abrogate the states' Eleventh Amendment immunity and whether the bankruptcy court's determination here violates the Tenth Amendment.
 
 
 20
 The first issue was addressed by the Supreme Court only two weeks before oral argument in this case. In United States v. Nordic Village, Inc., --- U.S. ----, 112 S.Ct. 1011, 117 L.Ed.2d 181 (1992), a corporate officer used corporate funds to pay his individual tax liability to the Internal Revenue Service. The corporation previously had filed for reorganization under Chapter 11, and the trustee in bankruptcy commenced adversary proceedings against the IRS, under 11 U.S.C. § 550(a), to recover the corporate funds paid.
 
 
 21
 The bankruptcy court ordered the IRS to return the funds, and the district court and court of appeals affirmed. The Supreme Court reversed, stating, "Neither Sections 106(c) nor any other provision of law establishes an unequivocal textual waiver of the Government's immunity from a bankruptcy trustee's claims for monetary relief.... Congress has not empowered a bankruptcy court to order a recovery of money from the United States...."
 
 
 22
 At first blush, this holding may appear to dictate a reversal here. There is, however, a distinction between the bankruptcy proceedings in Nordic Village and the bankruptcy proceedings here, a difference that takes this case outside the holding of Nordic Village and also forecloses the state's Eleventh Amendment argument entirely. At issue in Nordic Village was a claim for monetary damages pressed in adversary proceedings against the government; here we consider declaratory and injunctive relief only. Accordingly, we need not reach the question of the priority between Article I powers and Eleventh Amendment immunity.
 
 
 23
 The Supreme Court has long recognized that the Eleventh Amendment does not immunize the states from all judicial actions in federal courts. The foundational case in this area is Ex parte Young, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), in which the Court held that the Eleventh Amendment does not bar a federal court injunction to stop state officials from enforcing state laws that violate the United States Constitution.
 
 
 24
 In Edelman v. Jordan, 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974), the Court built on the Ex parte Young holding when it considered a private action against the Illinois Department of Public Aid for violations of federal regulations establishing procedures for payment of disability and other benefits. The district court had ordered the state both to follow the federal regulations and to "release and remit ... benefits wrongfully withheld." Id., 415 U.S. at 656, 94 S.Ct. at 1352.
 
 
 25
 On appeal, the state argued that both forms of relief violated the Eleventh Amendment, because both would require payments from the state's funds; the retroactive award of benefits clearly did, and the prospective order to follow federal regulations would result in additional benefits' being paid as a consequence of the change in procedures. The court of appeals affirmed, and the Supreme Court reversed in part. The Court held that the order to pay past benefits was "indistinguishable in many respected from an award of damages against the State." Id. at 668, 94 S.Ct. at 1358. Such an award infringed on the state's sovereign immunity and was barred by the Eleventh Amendment. Id. at 665, 94 S.Ct. at 1356.
 
 
 26
 The Court proceeded to hold, however, that the order requiring the state to comply with federal regulations did not violate the Constitution, even though one result would be that the state would pay more benefits in the future. The Court explained that the potentially problematic rule being enforced had roots deep in Eleventh Amendment jurisprudence:
 
 
 27
 As in most areas of the law, the difference between the type of relief barred by the Eleventh Amendment and that permitted under Ex parte Young will not in many instances be that between night and day. The injunction issued in Ex parte Young was not totally without effect on the State's revenues, since the state law which the Attorney General was enjoined from enforcing provided substantial monetary penalties against railroads which did not conform to its provisions. Later cases from this Court have authorized equitable relief which has probably had greater impact on state treasuries than did that awarded in Ex parte Young. [citing Graham v. Richardson, 403 U.S. 365 [91 S.Ct. 1848, 29 L.Ed.2d 534] (1971) (state prohibited from denying welfare benefits on basis of alienage); Goldberg v. Kelly, 397 U.S. 254 [90 S.Ct. 1011, 25 L.Ed.2d 287] (1970) (state prohibited from terminating welfare benefits without prior notice and hearing) ]. But the fiscal consequences to state treasuries in these cases were the necessary result of compliance with decrees which by their terms were prospective in nature. State officials, in order to shape their official conduct to the mandate of the Court's decrees, would more likely have to spend money from the state treasury than if they had been left free to pursue their previous course of conduct. Such an ancillary effect on the state treasury is a permissible and often an inevitable consequence of the principle announced in Ex parte Young.
 
 
 28
 Id., 415 U.S. at 667-68, 94 S.Ct. at 1357-58. Our role is to apply these precepts to the facts before us.
 
 IV.
 
 29
 The relief granted in the present case is declaratory and injunctive in nature. It is not an award of monetary damages. Under Section 362(a) of the bankruptcy code, the filing of the debtors' petitions "operate[d] as a stay, applicable to all entities," of Oklahoma's foreclosure action against the debtors. The bankruptcy court's approval of the debtors' reorganization plans, including the written-down mortgages, took the form of a declaratory order that binds each creditor, including the state. 11 U.S.C. § 1227(a). Discharge under Section 1228 is governed by the general provisions in Section 524(a); discharge "voids any judgment" obtained against the debtor concerning his or her personal liability for debts covered, and "operates as an injunction" against any action to recover on such debts. Id. § 524(a).
 
 
 30
 The Supreme Court has endorsed the view that Section 106(c) by its terms authorizes declaratory and injunctive relief only. In Hoffman v. Connecticut Income Maint. Dept., 492 U.S. 96, 109 S.Ct. 2818, 106 L.Ed.2d 76 (1989), two debtors in bankruptcy brought adversary proceedings against the state in the bankruptcy court to recover monetary relief. One debtor claimed overpayment of taxes and the other claimed Medicaid fees owed for services rendered. The bankruptcy court awarded money judgments on the grounds that Section 106(c) subjected the state to suit and authorized such relief.
 
 
 31
 Both the district court and the court of appeals held that Section 106(c) did not have this effect, and the Supreme Court agreed. Writing for the plurality, Justice White noted that Section 106(c)(2) makes the "determination ... of an issue" binding on the states but does not speak of "claims" or "proceedings" against the states:
 
 
 32
 The language of § 106(c)(2) is more indicative of declaratory and injunctive relief than of monetary recovery. The clause echoes the wording of sections of the [Bankruptcy] Code such as § 505, which provides that "the court may determine the amount or legality of any tax," 11 U.S.C. § 505(a)(1), a determination of an issue that obviously should bind the governmental unit but does not require a monetary recovery from a State. We therefore construe § 106(c) as not authorizing monetary recovery from the States. Under this construction of § 106(c), a State that files no proof of claim would be bound, like other creditors, by discharge of debts in bankruptcy, including unpaid taxes, [citations omitted], but would not be subjected to monetary recovery.
 
 
 33
 492 U.S. at 102, 109 S.Ct. at 2823. See also Nordic Village, --- U.S. at ----, 112 S.Ct. at 1013. This analysis applies with equal force in the case at bar.
 
 A.
 
 34
 The state argues that any analysis based on Ex parte Young and its progeny, which includes Edelman, is misplaced because the state has committed no unconstitutional or unlawful act here. Appellant's Br. at 42. In response, we note that any attempt by the state to resume its foreclosure action or otherwise enforce the debtors' obligations in disregard of the bankruptcy stay would constitute a wrongful act of the type contemplated in the teachings of Ex parte Young.
 
 
 35
 The state's argument, however, suffers from a more fundamental infirmity. The line of cases begun in Ex parte Young is not concerned so much with righting wrongs as with the relations between sovereigns in our federal system. "[T]he Young doctrine has been accepted as necessary to permit the federal courts to vindicate federal rights and hold state officials responsible to 'the supreme authority of the United States.' " Pennhurst State School & Hosp. v. Halderman, 465 U.S. 89, 105, 104 S.Ct. 900, 910, 79 L.Ed.2d 67 (1984) (quoting Ex parte Young, 209 U.S. at 160, 28 S.Ct. at 454).
 
 
 36
 What the Pennhurst court characterized as "[t]his need to reconcile competing interests" of the states and the United States is at the center of the present dispute. A bankruptcy court endeavors to settle the debtors' accounts according to the provisions of federal bankruptcy law. The state endeavors to protect its fiscal interests by putting its mortgage notes beyond the reach of federal law. That this appeal does not follow an encroachment by the state on federal constitutional or statutory rights is no more than a procedural by-product of the point at which the state chose to challenge the bankruptcy court's order. The issues would be unchanged had the state pressed its foreclosure action and waited for the debtors to use the order as a shield. In either event, federal law is supreme. The bankruptcy court's vindication of the debtors' federal statutory rights accords with Eleventh Amendment jurisprudence.
 
 B.
 
 37
 Oklahoma also argues that this court should oust the bankruptcy court of authority to interfere with the mortgages held by the state because of the interposition of the Eleventh Amendment as interpreted in Pennhurst and Dugan v. Rank, 372 U.S. 609, 620, 83 S.Ct. 999, 1006, 10 L.Ed.2d 15 (1963) ("The general rule is that a suit is against the sovereign ... if the effect of the judgment would be 'to restrain the Government from acting, or to compel it to act.' ") (quoting Larsen v. Domestic & Foreign Corp., 337 U.S. 682, 704, 69 S.Ct. 1457, 1468, 93 L.Ed. 1628 (1949)). Although Pennhurst is useful for its general description of the Eleventh Amendment, the case concerned proceedings in federal court against state officials for violations of state law. The Court took care to note that the state's immunity in state-law cases is far broader than in cases where federal law is at issue. 465 U.S. at 105-06, 104 S.Ct. at 910-11. Dugan was an action against the federal government and did not raise Eleventh Amendment concerns. 372 U.S. at 610, 83 S.Ct. at 1001. For the reasons heretofore expressed, we conclude that nothing in Pennhurst or Dugan affects the reasoning or result we reach here.
 
 V.
 
 38
 The state also argues that the Tenth Amendment bars the relief granted here. The Tenth Amendment provides: "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." In National League of Cities v. Usery, 426 U.S. 833, 852, 96 S.Ct. 2465, 2474, 49 L.Ed.2d 245 (1976), the Court held that this provision immunizes the states from suit in federal courts to enforce federal statutes that concern "areas of traditional government functions." Usery was explicitly overruled in Garcia v. San Antonio Metropolitan Transit Auth., 469 U.S. 528, 105 S.Ct. 1005, 83 L.Ed.2d 1016 (1985). Oklahoma nevertheless argues that this court should follow Usery because it is better reasoned and is likely to rise to new life in the near future. This court, however, must live in the present. The state's arguments here are unavailing.
 
 
 39
 The state also contends that the passage of Section 106(c) as a "last-minute floor amendment to a less restrictive bill" constitutes an extraordinary failure of the national political process of the sort envisioned in South Carolina v. Baker, 485 U.S. 505, 512, 108 S.Ct. 1355, 1360, 99 L.Ed.2d 592 (1988). The Court allowed that such a failure might warrant relief under the Tenth Amendment, but the Court articulated no test. Id. at 512-13, 108 S.Ct. at 1360-61. We do not conclude that the enactment of a floor amendment, a common occurrence in our political system, violates the Tenth Amendment.
 
 VI.
 
 40
 We have considered all the state's arguments, and we find no error in the disposition below. The judgment is
 
 
 41
 AFFIRMED.
 
 
 
 *
 Ruggero J. Aldisert, Senior Circuit Judge, United States Court of Appeals for the Third Circuit, sitting by designation
 
 
 [1]
 Not present here is a liquidation proceeding under Chapter 7. Thus, we are not faced with any problem associated with the teachings of Dewsnup v. Timm, --- U.S. ----, 112 S.Ct. 773, 116 L.Ed.2d 903 (1992). See In re Bellamy, 962 F.2d 176 (2d Cir.1992)